## RUSSELL and another *against* GREEN.

In a bill in chancery brought by *A* and *B,* against *C,* for an account, it was stated, that *A, B* and *C,* mutually agreed to purchase, and purchased accordingly, a quantity of pine lumber, to be owned and paid for, in these proportions ; one fourth by *A,* one fourth by *B,* and one half by *C ;* to be shipped to *New-York,* and there disposed of by *C,* who was to pay over the

*Middlesex,*
July, 1834.

Russell
*v.*
Green.

net avails to the persons concerned, according to their interests respective-ly. The committee found the agreement as stated, and that, in pursuance thereof, *A* and *B* purchased, each, one fourth part of a certain quantity of pine lumber, and *C* one half of the same quantity, and in connexion with *D*, a further quantity, besides some oak and chesnut lumber on his individ-ual account; all which he shipped to *New-York*, in 1816, consigned to *E* for sale; that soon afterwards, *C* gave *A* and *B* a receipt, stating that they owned a certain number of feet of the pine lumber shipped to *E*, and were entitled to receive the net avails of the average of such lumber, according to their proportion, when sold or accounted for by *E*; that *C* did not in-form *E*, that the lumber was owned by different persons, and did not direct him to keep separate accounts; that the pine lumber sold readily, but there was more delay about the oak and chesnut; that *C* received, from time to time, considerable sums of money from *E*, but no account; that in 1822, *C* made a compromise with *E*, taking his notes for a certain amount, and a deed of 500 acres of land in *Virginia*, for the remainder; that these notes and this deed were taken in the name of *C*, without any instructions from the other persons concerned; that the business was done by *C* in this manner, as he stated, for the greater convenience of transacting it, and was done in good faith, and was, as he believed, the best arrangement that could be made; that previous to the 8th of *March*, 1830, and on that day, *C* paid *A* and *B* 204 dollars, as their share of the avails of the lumber, and, at the same time, tendered them a conveyance of half of the *Virginia* lands; that *A* and *B* received the money, but refused to accept it in full of their claims, and also refused to take any part of the *Virginia* lands; and that the net avails of *A* and *B's* share of the lumber, were 662 dollars, the balance, after deducting the money paid, being 458 dollars.   Held, 1. that the case was within the reason, if not within the letter of the rule, that where there are more than two partners, resort must be had to chancery to settle their accounts, and consequently, there was not adequate remedy at law; 2. that the joint interest alleged in the bill, was supported by the finding of the committee; 3. that the money received by *C*, from *E*, may fairly be inferred to be avails of the joint concern; 4. that *C*, under the circumstances of the case, was not authorized to take the *Virginia* lands in part satisfaction of the claims of *A* and *B*; 5. that the reception of 204 dollars by *A* and *B*, was not a ratification of the act of *C*; 6. that *C* was bound to account with *A* and *B* for the net avails of their share of the lum-ber, and the balance of such avails being found to be 458 dollars, they were entitled to recover that sum; and 7. that great delay having inter-vened, not satisfactorily accounted for, they were also entitled to recover interest on such balance.

THIS was a bill in chancery for an account.   The bill sta-ted, That on the 6th of *February*, 1816, *John C. Russell*, *Warren Russell* and *Timothy Green* purchased 200,000 feet of pine lumber, for the sum of 3000 dollars, which was to be held, owned, and paid for, in the following proportions, *viz.* the *Russells* one quarter, each, and *Green* one half; that on the 1st of *September*, 1816, it was mutually agreed between these

*Middlesex,*
July, 1834.

Russell
*v.*
Green.

parties, that *Green* should ship this lumber to the city of *New-York*, and there dispose of it, and pay over the net avails thereof to the *Russells*, in proportion to their respective interests therein; that during the months of *October* and *November*, 1816, *Green* shipped to the city of *New-York* all of said lumber, and there disposed of it for the sum of 3000 dollars, exclusive of the expenses of transportation and sale, and applied the proceeds to his own use, without paying over to the *Russells* any part thereof; that the *Russells* have since, by themselves and their agents, made repeated application to *Green* to come to a full and fair account of the sales of said lumber, and to pay over to them, each, their proportion of the avails thereof, but that he has at all times refused and neglected to do either.

The court appointed a committee, who reported the following facts. In *February*, 1816, *John C. Russell*, *Warren Russell* and *Timothy Green* mutually agreed to purchase 100,000 feet of pine scantling, to be held, owned and paid for, by the parties, in these proportions, *viz.* one fourth part, by each of the *Russells*, and one half, by *Green;* and in pursuance of such agreement between themselves, they contracted with *Reuben Chapman*, that he should sell and deliver to them at *East-Haddam*, said 100,000 feet of pine scantling. *Chapman* having on hand a greater quantity of lumber, *Green* purchased, on his own account, such further part thereof, as with his half of said 100,000 feet, would make him the owner of one half the whole lot: the *Russells*, from the same lot, purchased and paid for the stipulated quantity. In the months of *September*, *October* and *November*, 1816, before the lumber was divided, *Green* shipped to *New-York*, in his individual name, consigned to *Andrew Jackson*, 124,941 feet thereof, which was owned as follows: 45,657 feet, by the *Russells;* 20,642 feet, by *Chapman*; and the remainder, 58,642 feet, by *Green*. During the same period, *Green* shipped to *Jackson* 93,751 feet of oak and chesnut lumber, owned wholly by himself.

Previous to the shipment, a contract was made between *Green* and *Jackson*, that the latter should dispose of this lumber and such other lumber as *Green* might send him, to the best advantage, on *Green's* account; that he should charge 62½ cents *per M.* cartage, and 10 *per cent.* commissions for selling, and that he should render his account of sales, when

required. On the 22nd of *January*, 1817, *Green* executed and delivered to the *Russells* a receipt, stating that they owned 45,657 feet of the pine scantling shipped to *Jackson*, and were to receive the net avails of the average of such lumber, according to their proportion, when sold or accounted for, by *Jackson*, agreeably to the contract made with him. In the consignment and sale of that part of the lumber which belonged to the *Russells*, *Green* acted as their agent.

In the year 1817, at different times, *Green* shipped to *Jackson* a further quantity of oak and chesnut lumber, amounting to 110,527 feet, and a quantity of other lumber, consisting of staves, &c. of the value of 246 dollars, 83 cents, owned wholly by himself, to be sold in like manner as the lumber previously sent; which he charged in his account with *Jackson*. The inspection and cartage of the whole of the lumber, and the freight of the lumber sent in 1816, were paid by *Jackson;* but not the freight of the lumber sent in 1817. He also paid to *Green*, on account of the sales of the lumber, at different times and in various sums, the amount of 2610 dollars, 69 cents.

No settlement was made with *Jackson* until *November*, 1822, when *Green* went to *New-York*, and finding some small parcels of the lumber unsold; that a considerable amount of debts for lumber sold remained uncollected; and fearing that he might lose, by a longer delay in the settlement, he made a settlement with *Jackson*, by compromise; *Jackson* agreeing that he would give *Green* his note for 100 dollars, payable on the 1st of *May*, 1823, and another note for 50 dollars, payable on the first of *August*, 1823, and convey to him a certain tract of land, containing 500 acres, in the county of *Bath* and state of *Virginia;* and *Green* stipulating to discharge *Jackson* from all further claims on account of the lumber shipped to him. *Jackson* gave the notes accordingly, and afterwards paid them; and also conveyed to *Green* said tract of land. The whole of this business with *Jackson*, was done by *Green*, in his own name; and the land was conveyed to him alone.

It did not appear, that any account of sales had been rendered by *Jackson;* nor was there any evidence shewing at what times, nor for what precise sums, the different parcels of lumber were sold. It was, however, proved, that nearly all the pine lumber was sold in the years 1816 and 1817.

In 1817, the price of lumber fell; and much delay was oc-

casioned by the difficulty of disposing of the oak and chesnut, and of collecting the debts due for the lumber sold. There was no evidence that either of the *Russells* ever gave any directions respecting said settlement, or even knew of it, until after it was made. In making it, however, *Green* acted with good faith, and did what, under the circumstances, he considered best for all concerned.

In addition to said sums of 2610 dollars, 69 cents, and 150 dollars, paid by *Jackson* to *Green*, he paid the further sums of 127 dollars, 82 cents, for the inspection of the lumber; 541 dollars, 73 cents, for the freight of the lumber sent in 1816; and 105 dollars, 77 cents, for the cartage; making the whole amount paid by *Jackson*, on account of the lumber, 3536 dollars, 6 cents. *Green* applied the moneys paid by *Jackson* as follows: 2,719 dollars, 90 cents, in payment of the oak and chesnut timber, staves, &c., owned by himself; 302 dollars, 13 cents, in payment of the pine lumber belonging to *Chapman*; and the remainder, being 514 dollars, 3 cents, he proposed to divide between the *Russells* and himself; and accordingly, on the 5th of *March*, 1830, he paid to the *Russells* 84 dollars, with the interest thereon, which, with the 120 dollars previously paid, he claimed, was their full share of the moneys received from *Jackson*, and, at the same time, offered them a conveyance of one half of the *Virginia* lands. The *Russells* received the 84 dollars and interest, but refused to accept the same in full of their share of the avails of the lumber, claiming a larger sum, and also refused to take any part of the *Virginia* lands. At this time, *Green* stated to the *Russells*, that he considered himself as having a right to pay his own private debt against *Jackson*, in preference to the joint claim of himself and them; that he took the land for their benefit, as well as his; and took the conveyance in his own name, for the greater convenience in transacting the business.

In computing the balance, after deducting his own and *Chapman's* private claims, *Green* mistook the amount, and did not pay the *Russells* as much as he intended; yet as he deducted his own and *Chapman's* private claims from the gross amount paid by *Jackson*, instead of the net amount after deducting the expenses of freight, inspection and cartage, the committee found, that if, in the opinion of the court, he was legally entitled to apply the moneys received of *Jackson*

*Middlesex,*
*July, 1834.*

Russell
*v.*
Green.

in payment of his private bill and *Chapman's* bill of lumber, and then divide the residue between himself and the *Russells,* he had paid them their share of the cash avails of the lumber, and they were only entitled to their share of the *Virginia* lands. But if the court should be of a different opinion, and should decide, that the *Russells* were not bound to take any part of the *Virginia* lands, then *Green* had no right to apply the moneys received of *Jackson* in the manner specified, and the *Russells* were entitled to recover the net avails of their part of the lumber; which ought to be computed at 662 dollars, 35 cents; and from that sum ought to be deducted the two sums paid by *Green,* amounting to 204 dollars, leaving a balance still due from *Green* to the *Russells* of 458 dollars, 35 cents; and, in the opinion of the committee, interest ought to be computed upon that sum from the 1st of *January,* 1819. But if the court should be of opinion, that a still different rule ought to be adopted, in the division of the moneys and lands received of *Jackson,* and that they ought to be divided among the owners of the lumber sent to *Jackson,* in proportion to their respective interests therein, the committee found, that the net avails of their respective shares ought to be computed as follows: the share of the *Russells,* 662 dollars, 35 cents; *Green's* share of the pine lumber, 857 dollars, 4 cents; his share of the oak and chesnut lumber, staves, &c., 2719 dollars, 90 cents, amounting in the whole, to 3576 dollars, 94 cents; and *Chapman's* share, 302 dollars, 13 cents. But as *Green* has paid *Chapman* for his share of the lumber, the amount of that share ought to be added to *Green's* share, thereby making, in the whole, the sum of 3879 dollars, 7 cents.

The net amount of moneys received of *Jackson,* over and above the charges by him paid for inspection, freight and cartage, is 2760 dollars, 69 cents; and of that sum there has been paid to the *Russells* 204 dollars.

The questions of law arising upon these facts, were reserved for the advice of this Court.

*Barnes* and *S. Clark,* for the plaintiffs, contended, That of the three modes of adjusting the accounts between the parties, presented by the committee, the second was the only one consistent with the facts and the equity of the case.

The correctness of the first mode depends upon the assumed

right of the defendant to pay himself for his private bill of lumber, then to pay *Chapman* for his bill of lumber, and then to divide the balance between himself and the plaintiffs. This is inadmissible ; because the plaintiffs had no interest in any part of the lumber, except the pine, and that was sold for cash. They are entitled to stand upon an equality with the defendant, in the distribution of this cash. Besides, the defendant, as agent of the plaintiffs, neglected his duty, and exceeded his authority. He is not to be regarded with favour, for several reasons. First, he did not keep clear and regular accounts of his transactions, and communicate their results, from time to time, to his employers. *Pal. Ag.* 46, 7. Secondly, he did not keep the property of his employers separate, but mixed it with his own private property ; and now, through his own fault, he is unable to make a distinction. *Pal. Ag.* 47. 1 *Madd. Ch.* 103. Thirdly, he compounded and commuted debts, without authority, express or implied. *Pal. Ag.* 220, 1. *Kingston* v. *Kincaid,* 1 *Wash. C. C. Rep.* 455.

The plaintiffs are not bound, in any event, to accept the lands in *Virginia.* They never authorized or ratified the act of the defendant in receiving those lands. It is not the usual course of trade to sell lumber for land. The plea of necessity is repelled, by the fact, that the defendant, at the time of the compromise, took the notes of *Jackson* on time, without security. Neither *Jackson*, nor the debtors for the lumber, appear to have been insolvent.

The third mode of adjustment suggested by the committee, is inequitable ; first, because the plaintiffs never consented, expressly or by implication, to stock their pine lumber with the oak and chesnut lumber of the defendant, and to run the hazard of the delay and other contingencies attendant upon the sale of the whole ; and secondly, because the plaintiffs, for the reasons already assigned, are not bound to take any part of the lands in *Virginia.*

From the facts found the defendant cannot claim the benefit of accounting in anything but money ; and, as the delay to account is imputable to him, *interest* follows of course. *Pal. Ag.* 48, 9.

The defendant cannot claim indulgence, by shewing that *Jackson* was guilty of neglect. *Jackson* was a subordinate

*Middlesex,*
July, 1834.

Russell
*v.*
Green.

agent. There was no privity between him and the plaintiffs. The defendant was a surety for *Jackson. Pal. Ag.* 48. 6.

The defendant is not entitled to consideration because he acted *in good faith,* when he made the compromise with *Jackson.* If loss ensues from the unauthorized act of an agent, it furnishes no defence to him, that he intended the benefit of his principal. *Pal. Ag.* 4, 5. If the defendant wished to be exempt from the responsibility which the law devolves upon an agent, he should have consulted his employers, from time to time, and taken their directions.

The balance, which the committee find to be due to the plaintiffs, is not too great. It is less than the actual balance. The defendant has furnished a rule for ascertaining it, by paying to *Chapman,* for his part of the pine lumber, 302 dollars, 13 cents. The proceeds of the lumber of the plaintiffs, by this rule, are 668 dollars, 26 cents. Deduct for payments, 204 dollars, the balance is 464 dollars, 26 cents; on which interest is to be computed from *January* 1st, 1819.

*Storrs* and *Bulkley,* for the defendant, contended, 1. That the bill was insufficient, there being adequate remedy at law, by an action of account.

2. That if the bill be sustainable, the decree should be, that the avails of the lumber and the land be divided among the parties in proportion to their interests.

3. That the interest found by the committee does not correspond with that alleged in the bill; the committee having found a joint interest, whereas the bill states a separate interest.

WILLIAMS, J. The defendant objects to this report, in the first place, that it appears upon the bill itself, that there is adequate remedy at law. It is certainly very late to take this exception, after the appointment of a committee, and a report of that committee, and all the attendant expenses have been incurred. If the court were satisfied, that it had no jurisdiction, I do not see but this objection would be fatal. But it has been decided, that wherever there are more than two partners, resort must be had to chancery to settle their accounts; as that is the only forum that can examine and adjust them in a single suit.

The contract shewn in this bill seems to be of that nature; though it is not so denominated.

These parties agree to purchase a quantity of pine lumber, to be held, owned and paid for, in these proportions : *John* and *Warren Russell* one quarter, each, and *Green* one half; *Green* to ship it to *New-York*, dispose of it, and pay over the net avails according to their interest. Of course, there was a community of interest in this lumber; as there was nothing to distinguish one part from another. The net avails were to be paid over. Each, therefore, was to share in profit and loss; which is the ordinary test of partnership. *Saville* v. *Robertson*, 4 *Term Rep.* 720. And without determining that these individuals would have been liable as partners for the lumber purchased, I think they would as partners have been liable for its freight to *New-York*. *Post* & al. v. *Kimberly* & al. 9 *Johns. Rep.* 470. At all events, whether partners or not, such difficulties exist in settling an account of this kind at law, that I cannot say there is adequate remedy there. This objection, then, cannot prevail.

Another objection has been made, that the interest found by the committee, does not correspond with that alleged in the bill : that the committee have found a joint interest, and the bill shows a separate interest in the owners of this pine lumber. The committee do, indeed, find, that after the lumber had been sent to *New-York*, *Green* executed to the *Russells* a receipt, stating the quantity they owned, and that they were to receive the net avails of the average of said lumber agreeably to their proportions, when sold, &c. They also find, that the lumber was purchased, to be held and paid for in the following proportions, *viz. John C. Russell* one fourth, and *Warren Russell* one fourth, each, and *Timothy Green* one half. This is precisely as stated in the bill. If the receipt, therefore, imported any thing to the contrary, as that is merely evidence, and perhaps but part of the evidence, the court must look to the facts as found by the committee. It is believed, however, there is nothing in the receipt inconsistent with the charge in the bill. That is a charge of a joint interest, stating how, upon settlement, the proportions are to be adjusted.

We come to the question upon what principle is this account to be settled. There is to be a loss, or *Virginia* lands must be taken. It seems, that in the year 1816, *Green* shipped this

*Middlesex,*
*July, 1834.*
——————
Russell
*v.*
Green.

lumber to the care of one *Jackson ;* that soon after, he con-signed to him a quantity of oak and chesnut lumber of his own ; and it does not appear, that he ever informed *Jackson* the lumber was owned by different persons, nor directed him to keep separate accounts ; that the pine lumber sold readily, but there was more delay about the oak and chesnut ; that *Green* received, from time to time, considerable sums of money from *Jackson,* but no account ; and that in 1822, he made a compromise with *Jackson,* took his notes for a certain amount, and a deed of 500 acres of land in *Virginia* for the remainder ; and that these notes and this deed were taken in his own name, and without any directions from the others concerned ; but that it was done in good faith, and was, as he believed, the best arrangement which could be made.

Now, had *Jackson* known, that this property was owned by different persons, it would have been his duty to keep separate accounts of the pine and oak lumber. Then, it would have been ascertained what part of the money was received upon the joint account and what upon the separate account ; what debts were lost upon one, and what upon the other. These facts are not, and probably cannot now be, ascertained ; and this may justly be ascribed to the neglect of *Green* in not giving this information. Until, then, *Green* shall shew, that the moneys received from *Jackson,* were received from the sales of his own lumber, it is fair to infer, that they were the avails of the joint concern. *Paley* on *Agency,* 47. As he has thus put it out of the plaintiffs' power to ascertain the facts, it is perfectly reasonable, that they should be taken against him ; but as the committee have not found whether the full amount of the pine lumber was received before the compromise, it is necessary to look to the effect of that compromise.

The lumber of the *Russells* and *Green* was principally sold in the year 1817, or before. *Green* sent it in his own name, and kept the account in his own name. A settlement was not effected until almost five years had elapsed. He then took notes in his own name, and a deed of land in his own name. Is it not a fair presumption, that he considered himself accountable to the other owners ? But he declared, that he took the land for their benefit, as well as his, and took the deed in his own name, for the greater convenience in transacting the business. Had he a legal right to do this ? I will not say, that in

the intercourse of business, an emergency might not arise, where no time could be allowed to consult with those interested, and no other property could be had, but that a person, under peculiar circumstances, might make a compromise of a claim of this sort, which a court of equity would sanction. But where no sudden emergency requires it; where there is ample opportunity to consult those interested, and it is omitted; and especially, where a compromise is made, by taking notes and deeds in his own name only; it would be unsafe to hold such a transaction to be obligatory upon persons in no other manner parties to it. And although, in this case, *Green* has conducted with perfect good faith, yet the precedent sought to be established, would serve as a cover for those, who, with the same opportunity, but with less integrity, should seek to advance their own interests at the expense of others. It is analogous to the case of a trustee, who buys in the trust property; which has often been holden to be invalid, although done from the best motives, on account of the danger of fraud.

It was hinted, that by accepting the 84 dollars, the plaintiffs had ratified this transaction. But when we look at the facts, it is found, that *Green* offered them 84 dollars and a conveyance of part of the land; and when they refused to receive the land, and refused to receive the 84 dollars in full, it is perfectly apparent, that it was not his expectation nor their intention, that the 84 dollars should be in full. And there is no rule of law construing an act of this kind, coupled with an express refusal to accept it in full, into an agreement to receive it in full, or a ratification of the act expressly refused to be ratified. *Green*, then, having received moneys, to a considerable amount, for the pine lumber, and lands to his satisfaction for the balance, is bound to account with the plaintiffs for the avails of that lumber; the balance of which the committee have found, to be 458 dollars, 35 cents. This sum the plaintiffs are entitled to recover. The committee recommend, if this principle is adopted, that interest be allowed from the 1st of *January*, 1819. As it appears, that most of the pine lumber was sold in 1817; as great delay has intervened; and as this delay is not satisfactorily accounted for; I should think it proper, that interest should be allowed; and would advise the superior court to accept the report of the committee, and grant the prayer of the bill, and allow the plain-

*Middlesex,*
July, 1834.

Russell
*v.*
Green.

tiffs the sum of 458 dollars, 35 cents, with interest from the 1st of *January,* 1819.

The other Judges were of the same opinion, except PETERS, J., who was absent.

Judgment for plaintiffs.